UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| MICHAEL J. COOPER, | CASE NO. 1:14CV2593 |
| Plaintiff, | |
| v. | MAGISTRATE JUDGE GEORGE J. LIMBERT |
| CAROLYN W. COLVIN[1], ACTING COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | MEMORANDUM OPINION AND ORDER |
| Defendant. | |

      Plaintiff Michael J. Cooper ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security Administration ("Defendant") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). ECF Dkt. #1. In his brief on the merits, filed on May 13, 2015, Plaintiff claims that the administrative law judge ("ALJ") erred in her decision because she failed to properly evaluate opinion evidence from treating sources and other sources, and unreasonably relied on testimony provided by a vocational expert ("VE"). ECF Dkt. #15. Additionally, Plaintiff argues that collateral estoppel did not control the ALJ's decision. *Id.* Defendant filed a response brief on August 12, 2015. ECF Dkt. #18. Plaintiff filed a reply brief on August 26, 2015. ECF Dkt. #21.

      For the following reasons, the Court AFFIRMS the ALJ's decision and DISMISSES the instant case with prejudice.

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

I.      **FACTUAL AND PROCEDURAL HISTORY**

On June 20, 2012, Plaintiff filed applications for DIB and SSI.  ECF Dkt. #11 ("Tr.") at 23.[2] These claims were denied initially and upon reconsideration.  *Id.*  Plaintiff then requested a hearing before an ALJ, and the hearing was held on April 8, 2013.  *Id.* at 47.

On May 3, 2013, the ALJ denied Plaintiff's applications for DIB and SSI.  Tr. at 20.  The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2013.  *Id.* at 26.  Continuing, the ALJ determined that Plaintiff had not engaged in substantial gainful activity for the periods of July 2006 to September 2007 and the first quarter of 2011, however, the ALJ found that there had been a continuous twelve-month period or periods during which Plaintiff did not engage in substantial gainful activity.  *Id.*  Accordingly, the ALJ continued to address the period(s) during which Plaintiff did not engage in substantial gainful activity.  *Id.*  The ALJ determined that Plaintiff had the following severe impairments: affective disorder; anxiety disorder; borderline intellectual functioning; and attention deficit disorder/attention deficit hyperactivity disorder ("ADD" and "ADHD," respectively).  *Id.* at 27.  Next, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Id.*

The ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with the following non-exertional limitations: performing simple, routine, repetitious work with one or two step instructions; a supervised, low-stress environment requiring few decisions; brief and superficial interactions with the public, co-workers, and supervisors; infrequent changes in work assignments; and no fast paced demands.  *Id.* at 30.  Continuing, the ALJ found that Plaintiff was unable to perform any past relevant work, was a younger individual, and had at least a high school education.  *Id.* at 36.  The ALJ did not consider

---

[2]All citations to the Transcript refer to the page numbers assigned when the Transcript was filed in the CM/ECF system rather than the page numbers assigned when the Transcript was compiled.  This allows the Court to easily reference the Transcript as the page numbers of the .PDF file containing the Transcript correspond to the page numbers assigned when the Transcript was filed in the CM/ECF system.

the transferability of job skills because it was not material since the Medical-Vocational Rules supported a finding that Plaintiff was not disabled. Based on the testimony of the VE, the ALJ found that, considering Plaintiff's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that Plaintiff could perform. *Id.* at 37. For the above stated reasons, the ALJ concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, from June 7, 1983 through the date of the decision. *Id.*

Plaintiff filed a request for review of the ALJ's decision with the Appeals Council, explaining that Plaintiff intended to file a new application for benefits, but that policies in place prevented him from filing at that time, and asking that "close-out-letters" not be sent until the Appeals Council acted on his request for review. Tr. at 19. Alternatively, Plaintiff presented the following new evidence pertaining to the period after the ALJ's decision: "[m]y condition has gotten worse since the ALJ's decision." *Id.* On October 16, 2014, the Appeals Council indicated that it had received the new evidence and then denied Plaintiff's request for review, finding no reason to review the ALJ's decision. *Id.* at 8-12. Accordingly, the ALJ's May 3, 2013 decision became the final decision of the Commissioner.

On November 25, 2014, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1. On May 13, 2015, Plaintiff filed a brief on the merits alleging the following assignments of error:

- A. The treating psychologist Thomas Haglund, Ph.D., reported that [Plaintiff] had problems with anger management and his anger could be triggered by a negative encounter; he had trouble with reading, math, and language processing; and he had problems with attention and concentration. The decision failed to identify Dr. Haglund as a treating source and failed to mention or weigh these reports as opinion evidence. This violated the treating physician rule.

- B. The decision must accept and adopt the opinions of treating mental-health therapists, or reject them and explain why. Therapist Erica Allen, PCC, IMFT, reported that [Plaintiff] "needs reminders to complete daily living activities," "struggles to tolerate stress in his daily routine and his workplace," and struggles to control his anger and irritability when faced with stressors." The decision failed to evaluate these opinion as evidence and assign them weight. The discussion of these opinions is not supported by substantial evidence.

-3-

>   C. The decision must accept and adopt the opinions of other types of specialists, or reject them and explain why. Vocational placement expert Dan Ferrell, of the County Developmental Disabilities agency, assisted [Plaintiff] for more than two years in trying both unsupported and supported employment, and testified that [Plaintiff] could not maintain sustained employment outside of an "enclave" with special supervision. The decision failed to note Ferrell's expertise in the amount of support needed for mentally-impaired people to work, failed to weigh this as opinion evidence, and failed to cite specific evidence against Ferrell's opinion.
>
>   D. The decision contains a reversible error of law. It applied *Drummond* and Acquiescence Rule (AR) 98-4(6) to hold that non-disability continued after a prior 2011 ALJ decision. Yet it failed to note evidence from before 2011 that was not in the record in 2011, evidence from after 2011 that showed worsening, and evidence from after the State-agency reviewing doctors reviewed the file and applied *Drummond* to deny.
>
>   E. The decision erred by relying on the testimony of a vocational expert that the three named occupations could be performed by a person who is limited to a "low stress environment," despite the VE's later concession that he interpreted "low stress" to mean all but the highest two percent of occupations in stress, such as surgeons and dynamite handlers. The ALJ did not mention the VE's unusual definition of "low stress," or seek to clarify whether the amount of stress in the named occupations would preclude [Plaintiff] performing them. [sic]
>
>   F. The decision erred by relying on the testimony of a vocational expert that the three named occupations could be performed by a person who can have "no fast paced production demands," despite the VE's later concession that it is "possible" that some of those jobs would have fast-paced requirements at times. The ALJ did not mention the VE's hedging testimony, or resolve the contradiction.

ECF Dkt. #15 at 1-2. Defendant filed a response brief on August 12, 2015. ECF Dkt. #18. Plaintiff filed a reply brief on August 26, 2015. ECF Dkt. #21. The parties consented to the jurisdiction of the undersigned on August 13, 2015. ECF Dkt. #20.

## II. SUMMARY OF THE RELEVANT PORTIONS OF THE ALJ'S DECISION

After providing a brief procedural history, the ALJ began by discussing Plaintiff's prior DIB and SSI applications that had been filed on September 28, 2009, alleging disability beginning October 1, 2007. Tr. at 23. The ALJ stated that these applications were denied initially and upon reconsideration, and that Plaintiff was found "not disabled" by a previous ALJ on November 22, 2011 (the "November 2011 Decision"). *Id.* Following these statements, the ALJ recognized that the November 2011 Decision mandated consideration of *Drummond v. Comm'r*, 126 F.3d 837 (6th Cir. 1997), wherein the Sixth Circuit "clearly stated that the doctrine of *res judicata* was applicable

to administrative proceedings." *Id.* The ALJ determined that *Drummond* was applicable to the instant case, and that he must adopt the determination made in the November 2011 Decision. *Id.* Accordingly, the ALJ adopted the November 2011 Decision and found that, considering Plaintiff's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that Plaintiff could perform. *Id.* at 24. The ALJ noted that about two months had elapsed between the prior decision and Plaintiff's subsequent application, and that the record did not contain new or material evidence establishing a significant change in Plaintiff's condition. Accordingly, the ALJ indicated that he was bound by the November 2011 Decision.

The ALJ indicated that Plaintiff met the insured status requirement of the Social Security Act through September 30, 2013, and that there had been continuous twelve-month periods during which Plaintiff did not engage in substantial gainful activity. Tr. at 26-27. It was made clear by the ALJ that there were also periods in which Plaintiff did engage in substantial gainful activity, and that the remaining findings in the decision were applicable only to those periods in which Plaintiff did not engage in substantial gainful activity. *Id.* at 26.

Continuing, the ALJ determined that Plaintiff had the following severe impairments: affective disorder; anxiety disorder; borderline functioning; and ADD/ADHD. Tr. at 27. The ALJ found that Plaintiff had non-severe impairments resulting from neck and back pain, but that these non-severe impairments had no more than a minimal effect on Plaintiff's ability to perform basic work activities. *Id.* In making this determination, the ALJ looked to the opinions of William Michael Masterson, D.O., stating that Plaintiff suffered from no functional limitation as a result of the neck and lower back pain, and Edward Butler, M.D., finding that Plaintiff had no physical restrictions. *Id.* Insofar as state-agency opinion evidence regarding Plaintiff's physical impairments, Abraham Mikalov, M.D., and Anton Freihofner, M.D., reviewed Plaintiff's case file, and both physicians opined that Plaintiff's physical impairments were not severe and adopted the RFC as set forth in the November 2011 Decision. *Id.* For these reasons, the ALJ found that the record did not contain new and material evidence establishing a significant change in Plaintiff's physical condition, and that he was bound by the RFC finding in the November 2011 Decision. *Id.* Plaintiff does not take issue with the ALJ's decision as it pertains to his physical impairments.

Next, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. at 27. The ALJ considered Plaintiff's physical impairments under Listing 1.02 (major dysfunction of a joint) and found that Plaintiff's impairments did not result in the inability to perform fine and gross movements, as required by Listing 1.00(B)(2)(c), and did not cause an extreme limitation in Plaintiff's ability to walk, as required by Listing 1.00(B)(2)(b). *Id.* at 28.

Insofar as Plaintiff's mental impairments, the ALJ considered Listing 12.02 (organic mental disorders), Listing 12.04 (affective disorders), Listing 12.05 (intellectual disability), and Listing 12.06 (anxiety-related disorders). Tr. at 28. The ALJ indicated that he considered whether the paragraph (B) criteria were satisfied (and paragraph (D) criteria for Listing 12.05). *Id.* To satisfy the paragraph (B) criteria (and paragraph (D) criteria for Listing 12.05), Plaintiff's mental impairments must result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. *Id.*

The ALJ determined that Plaintiff's activities of daily living were mildly restricted. Tr. at 28. To support this determination, the ALJ indicates that Plaintiff: had his own floor at his parents house to allow for privacy and more independent living; had a driver's license and drove; worked part-time; cooked simple meals; cleaned once or twice a week; did laundry once or twice a week; shopped once or twice a month; showered and dressed himself daily; watched television, listened to the radio, read, and played video games; and socialized with friends. The ALJ found that Plaintiff had moderate difficulties in social functioning because Plaintiff: reported that he had problems getting along with others; had a girlfriend; listed his strengths as being a good listener, liking to help people, and being a good friend; had four to five friends he saw once or twice a week; and participated in team sports such as basketball and bowling. *Id.* Regarding concentration, persistence, or pace, the ALJ determined that Plaintiff had moderate difficulties because he had been "slow" in past jobs, drives but does not drive long distances, and enjoys video games and socializing

online. *Id.* The ALJ found that Plaintiff had not experienced any episodes of decompensation of extended duration. *Id.* Accordingly, since Plaintiff's mental impairments were not found to cause at least two marked limitations, or marked limitation and repeated episodes of decompensation, each of extended duration, the ALJ found that the paragraph (B) criteria (and paragraph (D) criteria for Listing 12.05) were not satisfied for any of the listings considered. *Id.* at 29.

The ALJ also considered whether the paragraph (C) criteria of Listings 12.02, 12.04, or 12.06 were satisfied. Tr. at 29. The ALJ determined that the paragraph (C) criteria of Listings 12.02 and 12.04 were not satisfied because Plaintiff had not experienced: (1) repeated episodes of decompensation, each of extended duration; or (2) a residual disease process that had resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause Plaintiff to decompensate; or (3) a current history of one or more years of an inability to function outside of a highly supportive living arrangement, with an indication of continued need for such an arrangement. *Id.* Continuing, the ALJ found that Plaintiff did not meet the criteria of paragraph (C) of Listing 12.06 because he had not shown a complete inability to function independently outside the area of his home. *Id.*

Turning back to Listing 12.05, the ALJ indicated that under this Listing "mental retardation" referred to significantly sub-average general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22. Tr. at 29. The ALJ determined that the evidence failed to demonstrate deficits in adaptive functioning before age 22, and a review of the new evidence failed to show deficiencies before or after age 22. *Id.* In supporting this position, the ALJ cited Plaintiff's academic success in high school with the use of intervention specialists and curricular modifications, Plaintiff being deemed eligible for services based on specific learning abilities, not mental retardation, and an individualized education program from grade twelve showing that Plaintiff was outside of the regular classroom in special education classes less than twenty-one percent of the time. *Id.* Further, the ALJ indicates that while in high school, Plaintiff interned at an automotive technical program and worked on cars, boats, and trucks, where he was a successful student. *Id.* Continuing, the ALJ stated that Plaintiff said that he liked to take things

apart and put them back together, loved computers and could perform minor repairs, drove his own car, and could fill out job applications without assistance. *Id.* at 29-30. Finally, the ALJ discussed Plaintiff's substantial gainful activity in 2006 and 2007 working as an auto technician. *Id.* at 30. In conclusion, the ALJ found that Plaintiff's past work activities and activities of daily living were beyond the capacity of those of a mentally retarded person. *Id.*

Looking specifically to Listing 12.05(A), the ALJ found that it did not apply because there was no support that Plaintiff was mentally incapacitated as evidenced by dependance on others for personal needs and inability to follow directions such that the use of standardized measures of intellectual functioning was precluded. Listing 12.05(B) did not apply because Plaintiff did not have a valid verbal, performance, or full scale IQ of less than fifty-nine. *Id.* The ALJ determined that the paragraph (C) criteria of Listing 12.05 were not met because Plaintiff did not have a valid verbal IQ, performance IQ, or full scale IQ score of sixty through seventy and a physical or other mental impairment imposing an additional and significant work-related limitation. *Id.* The ALJ recognized that new evidence indicated that Plaintiff scored a verbal IQ of seventy-nine, a performance IQ of sixty-nine, and a full-scale IQ of seventy-four on April 13, 2006. *Id.* The ALJ stated that this new evidence did not meet Listing 12.05(C) because: (1) there was no statement in the accompanying narrative report as to whether the IQ score was considered valid and consistent with the development history and the degree of functional limitation; (2) it was not clear when the IQ testing took place based on the documentation provided; (3) the document gave measured intelligence as "borderline intellectual functioning," not mental retardation; and (4) the evidence failed to show deficits in adaptive functioning before age twenty-two as required by the introductory paragraph of Listing 12.05, regardless of the scores. *Id.* For these reasons, the ALJ determined that the IQ scores were not new and material evidence establishing a significant change in Plaintiff's mental condition. *Id.*

The ALJ determined that Plaintiff had the RFC to perform a full range of work at all exertional levels, but with the following non-exertional limitations: performing simple, routine, repetitious work with one or two step instructions; a supervised, low-stress environment requiring few decisions; brief and superficial interactions with the public, co-workers, and supervisors; infrequent changes in work assignments; and no fast paced demands. Tr. at 30. The ALJ continued

by reviewing the new medical evidence in the record. *Id.* at 31. The ALJ indicated that on March 11, 2011, Plaintiff's primary-care physician, Richard Devans, M.D., noted that Plaintiff was working forty to forty-five hours per week and was "over-tired" after working eleven-hour shifts. *Id.* Plaintiff's employer had agreed to eight-hour shifts, for a maximum of thirty-four hours per week. *Id.* Plaintiff had been over-spending and had been given a budget ledger to follow. *Id.* It was noted that Plaintiff said that he was doing fine on his medications and was no longer depressed. *Id.*

Continuing, the ALJ indicated that Plaintiff met with Dr. Devans on May 16, 2011, complaining of fatigue. Tr. at 31. Dr. Devans decreased Plaintiff's medication and talked with Plaintiff's parents about his spending habits. *Id.* The ALJ next noted that on June 17, 2011, Plaintiff's mother reported that the reduction of Plaintiff's medication was going fine, but that on July 15, 2011, Plaintiff told Dr. Devans that he was in trouble for pulling a knife on a co-worker. *Id.* at 31-32. Dr. Devans indicated that the knife incident was "more of a social mistake than a true act of aggression." *Id.* at 32. The ALJ indicated that Plaintiff sought outpatient mental health services on October 17, 2011, and counselor Erica Allen diagnosed Plaintiff with major depressive disorder, (recurrent and severe), ADHD (predominantly inattentive type), learning disorder (not otherwise specified), and assigned a GAF score of fifty-seven. *Id.* Plaintiff met with Ms. Allen about eleven times for twenty-five minute sessions. *Id.*

The ALJ discussed Plaintiff's March 12, 2012 counseling visit to Nord Counseling Services to discuss his anger issues, during which Plaintiff: appeared well groomed; had a euthymic mood and constricted affect; presented a logical thought process; and demonstrated cooperative behavior. Tr. at 32. Plaintiff was diagnosed with mood disorder (not otherwise specified) and impulse control disorder (not otherwise specified), and assigned a GAF score of 64. *Id.* Plaintiff was assessed as having some mild symptoms or some difficulty in social, occupational, or school functioning, but generally was found to be functioning pretty well with some meaningful interpersonal relationships. *Id.*

Next, the ALJ indicated that Plaintiff met with Thomas Haglund, Ph.D., and stated that "stupid people" triggered his anger. Tr. at 32. Dr. Haglund noted that Plaintiff appeared to be functioning pretty well. *Id.* The ALJ discussed Plaintiff's May 23, 2012 psychiatric evaluation

-9-

during which Plaintiff was noted as being well groomed, presenting a logical thought process, and displaying a euthymic mood. *Id.* It was also noted by the ALJ that Plaintiff's: affect was mildly constricted; behavior was cooperative; ability to abstract was moderately impaired; and intelligence was estimated at borderline. *Id.* Lorraine Christian, M.D., prescribed Abilify upon Plaintiff's indication that he wanted to feel more alert and manage mood swings. *Id.* Dr. Christian noted that Plaintiff did not present any overt symptoms. *Id.* The ALJ indicated that on June 20, 2012, Plaintiff told Dr. Christian that he was feeling better after taking the Abilify. *Id.* Plaintiff had made good progress and Dr. Christian asked him to return in a month. *Id.* Next, the ALJ stated that Dr. Haglund reported that depression is an on-going issue for Plaintiff and that he appeared to be benefitting from medication, and that Plaintiff had mild intellectual impairment and a low frustration tolerance in that he quits jobs when angered. *Id.* at 33.

Continuing, the ALJ noted that Plaintiff visited Dr. Haglund on July 18, 2012 and September 12, 2012, and that Dr. Haglund reported that Plaintiff was doing well at both visits, except noting during the latter visit that Plaintiff had quit his job due to scheduling issues. Tr. at 33. The ALJ discussed Plaintiff's September 19, 2012 visit to Dr. Haglund, during which Plaintiff was having no problems with side effects, and presented a euthymic mood and full affect. *Id.* On October 10, 2012, Dr. Haglund again reported that Plaintiff was doing well, adding that Plaintiff had no anger issues. *Id.* Further, Dr. Haglund indicated that Plaintiff reported that his parents were concerned because he often did not return home by his 2:00 A.M. curfew. *Id.* Further, Plaintiff indicated that he planned to work on his Ford Focus and then buy a Camaro, as Plaintiff liked "suping" up his cars using skills he had learned during his training as a mechanic. *Id.*

Next, the ALJ indicated that Plaintiff returned to Dr. Christian on December 19, 2012, stating that he was a "little tired," but he was willing to tolerate the tiredness because he felt the medication helped stabilize his mood. Tr. at 33. Dr. Christian noted that Plaintiff's mood was euthymic and his affect full, and that Plaintiff's thought process was logical and his behavior cooperative. *Id.* In March 2013, Plaintiff told Dr. Haglund that he had stopped taking his Abilify because it interfered with his sleep. *Id.* In May 2013, Plaintiff visited Dr. Christian and agreed to resume taking Abilify. *Id.* Dr. Christian reported that Plaintiff's mood was euthymic and his affect full. *Id.*

Based on the above analysis of the new evidence, the ALJ found that the record did not contain new and material evidence establishing a significant change in Plaintiff's mental condition. Tr. at 33. Continuing, the ALJ indicated that Plaintiff continued to be treated with infrequent appointments and that Plaintiff had not been hospitalized in a psychiatric facility. *Id.* The ALJ also determined that the record undermined the credibility of many of Plaintiff's allegations regarding the severity of his symptoms. *Id.* at 33-34. The ALJ found that Plaintiff continued to manage quite well despite his impairments, and that the new evidence showed that Plaintiff continued to engage in a wide variety of activities of daily living that were incompatible with disabling mental illness. *Id.* at 34. The ALJ noted that Plaintiff plays basketball and softball, sees friends multiple time over the course of the week, enjoys video games, and socializes with friends online. *Id.* Further, the ALJ stated that Plaintiff watched television, loved sports, went to car shows, fished with friends, participated in a bowling league, got together with buddies, went camping, attended Browns games, watched Cavaliers games, and continued to drive and work part-time. *Id.*

Additionally, regarding Plaintiff's allegation that he has trouble working more than thirteen to fifteen hours per week because he becomes overly exhausted, the ALJ noted that Plaintiff is involved in many activities and often stays out until past 2:00 A.M. Tr. at 34. The ALJ indicated that Plaintiff's job coordinator suggested to Plaintiff that his employment should take priority over basketball. *Id.* Accordingly, the ALJ concluded that Plaintiff's symptoms are not as severe as alleged or are due to lifestyle choices as opposed to mental impairments. *Id.* The ALJ also concluded that Plaintiff's representation that he was too slow was undermined by the fact that Plaintiff drives, plays sports and video games, and goes online. *Id.* Additionally, the ALJ determined that Plaintiff's allegation that he does not get along well with others is undermined by Plaintiff's participation in team sports and his activities with friends. *Id.* As a final point regarding Plaintiff's credibility, the ALJ states that Plaintiff testified that he lived with his parents, forgets to feed himself, shave, do laundry, let his dog out, brush his teeth, clean his bedroom, and make his bed. In response to these claims, the ALJ stated that Plaintiff, on multiple occasions at his primary care physician's office, endorsed having no difficulty performing or completing daily living activities. *Id.* Additionally, the ALJ indicated that Plaintiff reported to Dr. Butler that he: cooked

simple meals; cleaned once or twice a week; did laundry once or twice a week; shopped once or twice a month; showered and dressed himself daily; watched television, listened to the radio, read, and played video games; and socialized with friends. *Id.*

Continuing, the ALJ addressed the testimony of Dan Ferrell, a vocational placement specialist, indicating that Plaintiff's mental health impairments were his biggest issues and that stress cause by working more houre caused Plaintiff to become fatigued. Tr. at 35. The ALJ noted that Mr. Ferrell also indicated that Plaintiff's hours were cut due to his participation in the Special Olympics and problems at home, and that this was evidence that Plaintiff's lack of employment or reduced hours was due to reasons other that his mental impairments or limitations. *Id.* Further, the ALJ stated that Mr. Ferrell testified that Plaintiff had not taken his medications regularly, which was inconsistent with Dr. Haglund's June 20, 2012 statement indicating that Plaintiff had good attendance at appointments and good medication compliance. *Id.* The ALJ also discussed the opinion of Ms. Allen that Plaintiff could manage any benefits that may be due and the opinion of Dr. Haglund that Plaintiff may prefer help from his family, noting that Plaintiff sometimes chooses to perform to a lesser degree than the full extent possible. *Id.* Next, the ALJ determined that although Ms. Allen stated that Plaintiff struggled to control his anger, Plaintiff was effectively dealing with his anger as evidenced by treatment notes and mental status examinations. *Id.*

The ALJ again mentioned the State-agency physicians, noting that both physicians adopted the RFC as set in the November 2011 Decision pursuant to *Drummond*. Tr. at 35. Continuing, the ALJ stated that the record did not establish that Plaintiff's use of prescription medication was accompanied by side effects that would have interfered with his ability to perform work within the restrictions outlined in the decision. For the above reasons, the ALJ found that the record did not contain new and material evidence establishing a significant change in Plaintiff's physical or mental condition. *Id.* Accordingly, the ALJ indicated that he was bound by the November 2011 Decision, including the finding that Plaintiff retained the ability to perform a full range of work at all exertional levels, but with the above prescribed non-exertional limitations. *Id.*

Moving on, the ALJ found that Plaintiff was unable to perform past relevant work, was a younger individual, had at least a high school education, and that transferability of job skills was not

an issue because Plaintiff was not disabled. *Id.* at 36. The ALJ determined that, considering Plaintiff's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that Plaintiff could perform. *Id.* at 37. For the above stated reasons, the ALJ concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, from June 7, 1983 through the date of the decision. *Id.*

### III.    STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. §§ 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

### IV.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this

Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937 (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation omitted)). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole,* 661 F.3d at 937 (citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009) (internal citations omitted)).

## V.     LAW AND ANALYSIS

Plaintiff has asserted six assignments of error. The Court must first address Plaintiff's fourth assignment of error because it involves whether the doctrine of *res judicata* controlled the ALJ's decision.

### A.     Assignment of Error Four

Plaintiff's fourth assignment of error asserts:

> The decision contains a reversible error of law. It applied *Drummond* and Acquiescence Rule (AR) 98-4(6) to hold that non-disability continued after a prior 2011 ALJ decision. Yet it failed to note evidence from before 2011 that was not in the record in 2011, evidence from after 2011 that showed worsening, and evidence from after the State-agency reviewing doctors reviewed the file and applied *Drummond* to deny.

ECF Dkt. #15 at 22. *Drummond* stands for the principle that absent evidence of a change in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ. *Drummond,*

-14-

126 F.3d at 842; *see also* Acquiescence Ruling 98-4(6). "When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose." *United States v. Utah Const. & Mining Co.,* 384 U.S. 394, 422 (1966). In *Drummond*, the Sixth Circuit looked to whether substantial evidence was introduced to show that Plaintiff's condition changed significantly between the two hearing dates. *Drummond*, 126 F.3d at 843.

Plaintiff argues that the ALJ's decision failed to note that there was evidence in the record about events prior to 2011 that was not in the record at the time of the November 2011 Decision, and that this evidence presents new facts that precludes the application of administrative *res judicata*. ECF Dkt. #15 at 22-23. Continuing, Plaintiff contends that the ALJ failed to note evidence of worsening insofar as Plaintiff was prescribed a new medication and left an unsupported job for a supported job. *Id.* Finally, Plaintiff argues that the ALJ'd decision improperly adopted the opinions of two state agency reviewing psychologists without acknowledging that these psychologists reviewed the record after many of the alleged changes in Plaintiff's condition occurred. *Id.*

The Court agrees with Defendant that it is unclear what Plaintiff expects the Court to do with allegations that there is new evidence from an adjudicated period that was not considered during the November 2011 Decision. The burden Plaintiff must overcome to be successful on his subsequent DIB and SSI applications is to demonstrate that Plaintiff's condition had changed significantly (here, worsened) since the November 2011 Decision by presenting new material evidence. *See Drummond*, 126 F.3d 837. Evidence that existed during an adjudicated period is not relevant for this determination. As for the specific evidence that Plaintiff points out existed before the November 2011 Decision (pediatrician records, certificate of functioning level, the primary care record from 2011, records from 2001-2011 from "Cuyahoga County agency," and "Lorain County DD agency records 2011"), Plaintiff makes no argument that this evidence was unavailable or did not exist at the time of the November 2011 Decision. Simply put, the evidence that Plaintiff cites from the adjudicated period is not new evidence because it existed at the time of the November 2011 Decision and was available to Plaintiff. Plaintiff is not able to now claim that this evidence is new,

-15-

and then claim that *Drummond* does not apply because this "new" evidence changes the facts of his case. If there is evidence that existed before the November 2011 Decision that Plaintiff believes to be material, the proper action would have been to reopen the DIB and SSI applications to present the evidence. POMS SI 04070.015. Plaintiff's claims that the ALJ did not consider the evidence that existed at the time of the November 2011 Decision is likewise without merit because the ALJ was under no duty to review this evidence as it is not new evidence.[3] Plaintiff's argument that new facts have been presented by this evidence that existed at the time of the November 2011 Decision and that these new facts prevent *res judicata* from applying in this case is not persuasive.

Plaintiff's assertion that the ALJ failed to note evidence of the worsening of his condition is also without merit. There is no specific argument as to how Plaintiff's condition worsened beyond stating that he was put on an additional medication and that he changed jobs from an unsupported job to a supported job where he was under supervision. ECF Dkt. #15 at 23. Plaintiff fails to note that he was prescribed Abilify per his request because he was feeling tired, rather than on the opinion of a physician on the basis that Plaintiff's condition was worsening. Tr. at 32, 715-720. There is no opinion evidence from a medical professional indicating that the Abilify was prescribed due to the worsening of Plaintiff's condition. In fact, Plaintiff indicated that, despite making him tired, the medication that he was on before Abilify was helping with his symptoms of depression. *Id.* at 715. The ALJ provided a detailed review of the new evidence that was obtained after the November 2011 Decision. Tr. at 31-35. Contrary to Plaintiff's position that his condition worsened, the prescription of Ability seemed to improve Plaintiff's condition during the time he was taking the medication. This was discussed by the ALJ, who notes that from the time Plaintiff was prescribed Abilify in May 2012 through December 2012, when Plaintiff stopped taking Abilify, Plaintiff "reported he was feeling better with the Abilify," "appeared to be benefitted from medication," "had no complaints or concerns about his medication," "was doing well on

---

[3]The undersigned notes that the ALJ does provide some analysis of evidence from the previously adjudicated period. Neither party asserts that this was an error, and, even if it was, it was harmless because the ALJ properly assessed the evidence from the unadjudicated period following the November 2011 Decision.

medications," and "[had] no problems with medications or side effects." Tr. at 32-33. Further, the ALJ detailed how Plaintiff's appearance and mood were average or above average at every one of the seven doctor's appointment that took place while Plaintiff was on Abilify. *Id.* There is no evidence to suggest that Plaintiff was placed on Abilify because his condition was worsening, but rather because he requested the change of medication. Likewise, there is no evidence that Plaintiff's condition worsened after being placed on Abilify, and, to the contrary, Plaintiff's condition appears to have improved.

There is no evidence suggesting that Plaintiff switched from an unsupported job to a supported job where he was supervised because his condition had worsened, and Plaintiff does not specifically indicate how he believes the job change demonstrates that his condition had worsened. Following the November 2011 Decision, the ALJ discussed how Plaintiff remained perfectly capable of playing basketball and softball, spending time with friends, playing video games, socializing online, watching television, going to car shows, Browns games, and Cavaliers games, fishing, driving, and participating in a bowling league. Tr. at 34. Moreover, the ALJ noted that Plaintiff reported that he often stayed out until after 2:00 A.M. *Id.* at 33. Plaintiff's activities of daily living provide ample evidence that Plaintiff did not change jobs because his condition was worsening.

Finally, Plaintiff's argument that the ALJ failed to indicate that the state-agency psychologists did not have all of the evidence regarding the unadjudicated period after the November 2011 Decision is without merit. The ALJ indicated that one state-agency psychologist reviewed Plaintiff's case file in April 2012 and the other in July 2012. Tr. at 35. The ALJ clearly indicated the dates on which the reviews took place. When discussing the new evidence, the ALJ began by dating each paragraph to indicate when the new medical evidence was obtained. *Id.* at 31-33. The ALJ has made it clear that he knew that the state-agency psychologists did not have all of the new evidence, as shown by the fact that the ALJ clearly indicated the dates of both reviews of Plaintiff's case file, as well as the dates the new evidence was obtained.

For the foregoing reasons, the Court finds that Plaintiff failed to provide new and material evidence showing that his condition had worsened, and thus the ALJ did not err when applying *Drummond* to hold that Plaintiff's non-disabled status continued after the November 2011 Decision.

### B. Remaining Assignments of Error

The Court has determined that the doctrine of *res judicata* applies in this case, and thus the RFC finding and other findings required under the sequential evaluation process for determining disability in the November 2011 Decision are controlling. *See* Acquiescence Rule 98-4(6). Plaintiff's remaining assignments of error assert errors in the ALJ's treatment of the opinions of the treating physician and other sources, and the testimony of the VE. The remaining assignments of error all allege failures that occurred during the sequential evaluation process for determining disability. Since the Court has determined that the ALJ properly applied *Drummond*, the remaining assignments of error are barred by *res judicata.*

### VI. CONCLUSION

For the foregoing reasons, the Court AFFIRMS the ALJ's decision and DISMISSES Plaintiff's complaint in its entirety with prejudice.


Date: March 3, 2016                    */s/George J. Limbert*
                                        GEORGE J. LIMBERT
                                        UNITED STATES MAGISTRATE JUDGE